**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION AT DAYTON**


Lalit Gupta,

*Plaintiff,*

v.                                                              **Case No. 3:16-cv-483
Judge Thomas M. Rose**

City of Dayton,

*Defendant.*

---

**ENTRY AND ORDER GRANTING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT, ECF 13, DECLINING TO EXERCISE JURISDICTION OVER PENDANT CLAIMS AND TERMINATING CASE.**

---

Pending before the Court is Defendant's Motion for Summary Judgment. ECF 13. Therein, Defendant City of Dayton requests that the Court grant summary judgment on Plaintiff Lalit Gupta's claims of racial discrimination, national origin discrimination and retaliation. Because many of Plaintiff's claims are time-barred, because Plaintiff was not qualified by reason of disability for the position he sought in 2016, and because the Court will decline to exercise pendant jurisdiction over Plaintiff's remaining claims, Defendant's motion will be granted in part and the remaining claims dismissed.

I.        **Background**

Plaintiff Lalit Gupta was born in New Delhi, India. (Gupta Depo. at 17). Gupta holds Bachelor of Science degrees in Mechanical and Electrical Engineering from the Institute of

Engineers in Calcutta, India. (Gupta Depo. at 10). Gupta came to the United States in 1987. (Gupta Depo. at 17). He has lived in Dayton, Ohio almost continuously since that time. (Id.)

Gupta began his employment with the City of Dayton on May 15, 1989. (Heidrich Aff. Ex. 1). He was hired as a Wastewater Engineer in the Wastewater Treatment Division of the City's Water Department, and he held that role throughout most of his tenure with the City. (Gupta Depo. at 37-38).

From 1989 to 2009, Gupta's direct supervisor was Wastewater Treatment Division Manager Thomas Schommer. (Gupta Depo. at 59.) Gupta regularly filled in for Schommer as Division Manager when Schommer was absent, and he assisted Schommer with performing many of his duties. (Heidrich Aff. Ex. 2 at Gupta 2370, Heidrich Aff. Ex. 3, Gupta Depo. Ex. 4 ). Gupta effectively served as Schommer's "second in command," and Gupta's goal had always been to become the manager when the opportunity arose. (Gupta Aff. at ¶ 2). Schommer's final review of Gupta's performance reflects that Gupta was a highly skilled, well-respected employee who met or exceeded all performance metrics. (Heidrich Aff. Ex 4).

From 1987 to 2000 (at which time there was a major reorganization in the Wastewater Treatment Division), Gupta helped Schommer supervise a staff of approximately 25 individuals. (Gupta Depo. at 40, Heidrich Aff. Ex. 5).

In July 2009, Schommer retired. (Gupta Depo. at 59). Water Department Director Tammi Clements appointed Phil Bennington, a white, American-born male, to fill the role on an interim basis while the City searched for a permanent Division Manager. (Clements Depo. at 10, Gupta Aff. at ¶ 3).

Clements was responsible for interviewing and hiring a candidate to fill the Division Manager position on a permanent basis. (Clements Depo. at 15.) Gupta applied for the Division Manager role and was interviewed along with other candidates in September 2009. (Heidrich Aff. Ex. 30). Gupta was not notified whether he was selected for the position following his September 2009 interview. On that basis, he assumed he was still being considered for the role. Gupta Aff. at ¶ 5). Clements continued interviewing candidates beyond September 2009. (Heidrich Aff. Ex. 6 at Gupta 1283).

On November 8, 2009, Clements removed Bennington from the acting Division Manager position. (Clements Depo. at 13). On November 9, 2009, Clements and Administrative Division Manager Pete Hannah approached Gupta and asked if he would like to be the acting Division Manager. (Clements Depo. at 25). Clements told Gupta that he would serve as the acting Division Manager for a six-month probationary period, and then he would be made the permanent Division Manager. (Gupta Depo. at 64-65). Gupta accepted Clements's proposal. (Gupta Depo. at 64-65).

Gupta became the acting Division Manager on November 16, 2009. (Gupta Depo. at 67). Six months came and went, and Clements said nothing to Gupta about the status of his probationary period or his transition to permanent Division Manager. (Gupta Depo. at 97). However, Gupta believed that he was performing well in the role and that he would eventually be made the permanent Division Manager. (Gupta Depo. at 97).

Clements did not conduct a performance evaluation of Gupta during his tenure as acting Division Manager. According to Clements, the reason Gupta was not evaluated during his time as acting Division Manager was that he was not due for an evaluation during that period. (Clements Depo. at 32). According to Gupta, he had received his most recent annual review in July 2009,

and he was due for another review in July 2010 (when he was still in the acting Division Manager role). (Heidrich Aff. Ex. 4)

On October 4, 2010, after Gupta had been the acting Division Manager for nearly a year, Clements told Gupta that she had hired Gary Marshall, a white, American-born male, to be the permanent Division Manager. (Gupta Aff. at ¶ 3, Gupta Depo. at 98-103). Gupta did not know that Clements was continuing to search for a permanent Division Manager while he was serving as acting Division Manager, and he was "stunned" by Clements's announcement. (Gupta Depo. at 98-103).

Clements states that she did not retain Gupta in the Division Manager role because: (1) Gupta required assistance preparing the budget; (2) his morning meetings were unproductive and disorganized; and (3) there were morale problems in the Division during his tenure. (Def. Mot. Summ. J., Doc. 13, PageID 54-55). Gupta admits there were problems with employee morale and the morning meetings, calling them preexisting. ECF 25, PageID 626.

The City also asserts that Clements selected Marshall over Gupta because Marshall had superior interpersonal skills and because he possessed the equivalent of a Class IV Wastewater Works Operator Certificate. (Def. Mot. Summ. J., Doc. 13, PageID 57). The job description contained the following minimum requirements: (1) a Bachelor's degree in engineering or science; (2) five years of experience in wastewater treatment; (3) three years of experience in general management/supervision, and two years of management experience at a Class III or IV wastewater facility; (4) possession of a Class III Wastewater Works Operator Certificate; and (5) the qualifications to be accepted as an Ohio EPA Class IV Wastewater Works Operator Candidate.

(Id.).  Gupta met each of these requirements. (Gupta Depo. at 37-38, 40; Gupta Depo. Ex. 1; Gupta Aff. at ¶ 6-7, Heidrich Aff. Ex. 5).

The City of Dayton submitted an affidavit wherein Clements states the "principal accountabilities" for the Division Manager position. (Clements Aff., Doc. 13-1, at ¶ 8, PageID 80). None of the "principal accountabilities" stated by Clement were listed in the job description for the Division Manager position in 2009-2010. (Heidrich Aff. Ex. 8).  The job description states that the "primary responsibility of the Wastewater Treatment Manager is to ensure that all water discharged to the Great Miami River meets Federal, State, and local standards for clean water." Clements does not allege that Gupta was unable to meet this responsibility during his tenure as acting Division Manager and she admitted that Gupta had "technical expertise." (Clements Depo. at 18).

Schommer's final performance evaluation of Gupta noted that he is a "team player", "cooperate[s] to build a positive work environment to improve overall performance of the Division," "work[s] very well with plant staff, City staff, consultants, attorneys, OEPA and others," and "is very flexible and always tr[ies] to work with a can-do attitude." (Heidrich Aff. Ex. 4).

The City also states that its belief that Gupta did not have sufficient management experience was "shared by the Ohio EPA."  When Gupta applied for his Class IV license, the Ohio EPA asked for more clarification regarding Gupta's management experience, but once he provided that explanation, the Ohio EPA granted the license. (Heidrich Aff. Ex. 9, 10).

Marshall assumed the Division Manager role in October of 2010 and Gupta returned to his Wastewater Engineer role. (Heidrich Aff. Ex. 11).  On November 8, 2010, Marshall threatened to

slap Gupta. (Gupta Depo. Ex. 10). Gupta reported this to Clements. (Id.). Clements initially denied to the Equal Employment Opportunity Commission that Gupta ever told her about the threat. (Heidrich Aff. Ex. 6 at Gupta 1283-84). Clements knew about the allegation of a threat (Clements Depo. at 53) and stated that she instructed Pete Hannah to investigate the incident. (Clements Depo. at 54). Hannah stated that his investigation was limited to asking Marshall whether or not he made the threat, and that when Marshall denied it, Hannah took no further action. (Hannah Depo. at 31). Clements did not discipline Marshall in response to the threat. (Clements Depo. at 55).

During his tenure, Marshall held meetings without Gupta. (Gupta Depo. at 168-169; Bennington Depo. Ex. 4). On March 12, 2010, Marshall made a comment about applying sludge to a field, asking if it was at Lalit's "big house" (Bennington Depo. Ex. 2). Marshall never entrusted Gupta to serve in the capacity of acting Division Manager in the Division Manager's absence. (Gupta Aff. at ¶ 10, Heidrich Aff. Ex. 12). Instead, he asked other employees to fill the role. (Id.).

In 2011, the Water Department created a new position called Wastewater Treatment Administrator. (Def. Mot. Summ. J., Doc. 13, PageID 58). The new Administrator would report directly to the Division Manager. (Id.). Matt Carpenter, who at that time was the Deputy Director of the Water Department, led the hiring process for the position, subject to Clements's approval. (Clements Depo. at 43-44). Jason Tincu, a white, American-born male, was hired for the position. (Def. Mot. Summ. J., Doc. 13, PageID 58; Gupta Aff. at ¶ 3).

The City first posted the Administrator job in March 2011. (Heidrich Aff. Ex. 14). The March 2011 posting contained the following requirements: (1) a Bachelor's degree in engineering

or a science-related discipline; (2) five years of experience in wastewater treatment; (3) two years of supervisory experience; and (4) the criteria to be accepted as a Class IV Wastewater Treatment candidate at the time of appointment. (Id.). Gupta met all of these requirements and submitted an application. (Gupta. Depo. at 37-38, 40; Gupta Depo. Ex. 1; Gupta Aff. at ¶ 6-7; Heidrich Aff. Ex. 5, 15).

Pursuant to the City's Civil Service Hiring Rules, the Civil Service Board released a Pre-Certification list of individuals who met the qualifications for the Administrator job and could be interviewed. (Bennington Depo. Ex. 6). Gupta's name was on the list, along with several others. (Id.). Tincu, who was ultimately hired for the job, did not appear on the Pre-Certification list. (Id.). Tincu did not meet at least one of the job requirements– he did not hold a Bachelor's degree in engineering or a related field. (Heidrich Aff. Ex. 16). He held a Bachelor's degree in management from the University of Phoenix, and an Associate's degree in wastewater treatment plant operations from Sinclair Community College. (Id.).

In August 2011, the City re-posted the Administrator job, this time with different requirements. (Heidrich Aff. Ex. 17-18). This time, the job description was expanded to allow a Bachelor's degree in management, or an Associate's degree in engineering, wastewater technology, or a related field. (Heidrich Aff. Ex. 17). The City also changed the job posting to state, "Class IV, OEPA Wastewater Certification at time of appointment is preferred." (Id.). Although Gupta met the requirements to be accepted as a Class IV candidate and his application was in progress at that time, he did not yet have a Class IV certificate. (Gupta Aff. At ¶ 6-7, Heidrich Aff. Ex. 9). Jason Tincu did have a Class IV certificate. (Def. Mot. Summ. J., Doc. 13, PageID 58).

The Civil Service Board released a new Pre-Certification list based upon the new requirements. (Heidrich Aff. Ex. 19). Gupta's name was again on the list. (Id.). Tincu's name was also on the list. (Id.).

Clements explains why the job description was expanded to include different degrees and certificates by stating that she asked for the education requirements of many Water Department jobs to be changed at that time to encourage promotion of internal candidates. (Clements Depo. at 45-46). While it is true that Clements requested changes to the educational requirements of some Water Department jobs, she did so in April 2012, after Tincu had already been hired. (Heidrich Aff. Ex. 20). She did not propose any change to the Wastewater Treatment Administrator position. (Id.).

The City states that Tincu was hired over Gupta because Tincu had "superior interpersonal skills and management experience to the Plaintiff." (Def. Mot. Summ. J., Doc. 13, PageID 58). Neither the March 2011 or August 2011 job posting make any reference to management or interpersonal skills. (Heidrich Aff. Ex. 16-17). Moreover, Gupta had approximately 14 years of experience in supervising and managing employees, including his time as acting Division Manager. (Gupta Depo. at 40, Heidrich Aff. Ex. 5). Tincu had less than seven years of management experience. (Def. Mot. Summ. J., Doc. 13, PageID 70).

In July 2013, Gary Marshall left his employment at the City and vacated the Division Manager role. (Heidrich Aff. Ex. 21). Clements did not open the position to applicants. Instead, she appointed Tincu to the role. (Clements Depo. at 41). Although Clements testified at her deposition that there was a succession plan that dictated that the Administrator would generally fill the Division Manager role when it was vacated, (Clements Depo. at 41, 46- 47), this proved to

be untrue. Matt Carpenter testified that there "was definitely not a formal policy[.]" (Carpenter Depo. at 26). When asked to produce a copy of the alleged succession plan, the City produced a "Workforce Planning Guide" which contains no reference to the Administrator or Division Manager role (Heidich Aff. Ex. 22).

Tincu vacated the Administrator position upon his promotion to Division Manager. Gupta did not apply for this position because he believed from his past experiences that it was futile to do so. (Gupta Aff. at ¶ 9). Dave Wilson, a white, American-born male, was hired for the position. (Gupta Aff. at ¶ 9, Heidrich Aff. Ex. 29).

In November 2012, while Marshall was Division Manager and Tincu was Administrator, Gupta took a three-day vacation. (Tincu. Depo. Ex. 2). When Gupta returned, Tincu made the comment, "Lalit is back from vacation, should we start the plant?" (Id.). Then Tincu called over Marshall and made a sarcastic comment about Gupta's haircut. (Id., Gupta Depo. at 184).

Tincu became the Division Manager, in July 2014, after the City provided an opportunity for employees to attend meetings with a dietician. (Clements Depo. Ex. 4). Tincu told employees that they were not to use "city time" to meet with the dietician. (Heidrich Aff. Ex. 23). Gupta, who was a salaried, exempt employee, requested clarification from Human Resources regarding Tincu's instruction. (Clements Depo. Ex. 4, Clements Depo. at 59). When Tincu heard about Gupta's inquiry to Human Resources, he demanded that Gupta provide him with copies of his correspondence with Human Resources. (Gupta Depo. Ex. 15). At his deposition, Tincu defended this behavior. He stated that he did not believe that his employees should have a right to have confidential communications with Human Resources, but instead should go through him. (Tincu. Depo. at 39). Gupta and Tincu's relationship deteriorated rapidly from that point.

On August 21, 2014, Tincu cornered Gupta in his office and shut the door so that Gupta could not leave. (Heidrich Aff. Ex. 24, PageID 709). Tincu yelled at Gupta and used threatening and insulting body language. (Id.). Among other things, Tincu accused Gupta of being "chronically late" to work. (Id.).

> [Gupta]was chronically tardy to work, 15, 20 minutes, 22 minutes after 7:00 every day, and it was becoming more and more of an issue for our work culture. We were in the midst of an organizational development movement across the plant to unify the workplace, unify the work groups, and having select rules for select groups and certain freebies for other groups was not conducive to transforming an organization.

PageID 534.

Following the August 21 incident, Gupta became anxious and depressed and was required to take medical leave. (Heidrich Aff. Ex. 24). Gupta emailed Tincu and said that Tincu's "words and this event have constantly been troubling me." (Id.). Gupta also informed Tincu that his physician had recommended that he take two weeks off of work due to depression. (Id). Tincu forwarded Gupta's email to Clements noted it was "stress leave," putting it in quotations. (Tincu Depo. Ex. 5). On December 31, 2014, Gupta emailed Tincu claiming he was "becoming increasingly sick, given the hostile and unprofessional way in which you talk to me." (Gupta Depo. Ex. 13).

In February 2015, Tincu resigned his employment with the city and vacated the Division Manager position. (Heidrich Aff. Ex. 25). Phil Bennington stated that Tincu resigned his employment because Clements had given Tincu a bad performance review and told him that he "would not have a future with the city." (Bennington Depo. at 45-46). Clements chose Wilson, a white, American-born male, to replace Tincu on an interim basis. (Gupta Aff. at ¶ 3, Wilson Depo.

at 28). The Division Manager position required a Bachelor's degree. (Heidrich Aff. Ex. 26). Wilson does not have a Bachelor's degree. (Wilson Depo. at 6-7)

As acting Division Manager, Wilson continued Marshall and Tincu's alienation of Gupta. Wilson excluded Plaintiff from meetings. (Bennington Depo. Ex. 5). Although Gupta's job description stated that he was to serve as the acting Division Manager in the Division Manager's absence, Wilson never made Gupta acting Division Manager. (Gupta Aff. at ¶ 10). On at least one occasion, Wilson chose Bennington to serve as acting Division Manager in Wilson's absence, even though Bennington had been involuntarily removed from that role due to his misconduct in 2009. (Clements Depo. at 13, Wilson Depo. Ex. 1).

The Division Manager position was posted, and Gupta again applied for it. (Clements Depo. Ex. 5). While the hiring process was ongoing for the Division Manager position in 2015, Gupta took disability retirement due to depression. (Def. Mot. Summ. J., Doc. 13, PageID 60). Clements's handwritten notes on Gupta's application materials state that Gupta was "previously interviewed," had "no management experience," and that he served as acting Division Manager for "less than six months." (Clements Depo. Ex. 5, Clements Depo. at 65-66). In fact, as Clements knew, Gupta had supervised 25 employees for 13 years, filled in for and assisted Schommer for decades, and served as the acting Division Manager for nearly a year.

After Gupta retired, the City filled the vacant Division Manager position. Chris Clark, a white, American-born male, was chosen to fill the position. (Def. Mot. Summ. J., Doc. 13, PageID 60, Gupta Aff. at ¶ 3). Like Wilson, Chris Clark does not have a Bachelor's degree, although it was required for the job. (Heidrich Aff. Ex. 27)

Since Gupta's retirement, his job duties have been performed by Nick Dailey, a white, American-born male. (Gupta Aff. at ¶ 3, Heidrich Aff. Ex. 28).

On November 23, 2016, Gupta filed suit in federal court asserting racial discrimination and national origin discrimination for failure to promote in violation of Title VII, 42 U.S.C. § 2000e, and 42 U.S.C. § 1981, racial and national origin discrimination under Ohio Revised Code § 4112, and retaliation under Ohio Revised Code § 4112.

## II.     Standard

The standard of review applicable to motions for summary judgment is established by Federal Rule of Civil Procedure 56 and associated case law.   Rule 56 provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).   Alternatively, summary judgment is denied "[i]f there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Hancock v. Dodson*, 958 F.2d 1367, 1374 (6th Cir. 1992) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986)).   Thus, summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The party seeking summary judgment has the initial burden of informing the court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, admissions and affidavits which it believes demonstrate the absence of a genuine

issue of material fact. *Id.*, at 323. The burden then shifts to the nonmoving party who "must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S., at 250 (quoting Fed. R. Civ. P. 56(e)).

Once the burden of production has shifted, the party opposing summary judgment cannot rest on its pleadings or merely reassert its previous allegations. It is not sufficient to "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Rule 56 "requires the nonmoving party to go beyond the pleadings" and present some type of evidentiary material in support of its position. *Celotex Corp.*, 477 U.S., at 324.

In determining whether a genuine issue of material fact exists, a court must assume as true the evidence of the nonmoving party and draw all reasonable inferences in the favor of that party. *Anderson*, 477 U.S., at 255. If the parties present conflicting evidence, a court may not decide which evidence to believe by determining which parties' affiants are more credible. 10A Wright & Miller, *Federal Practice and Procedure*, § 2726. Rather, credibility determinations must be left to the fact-finder. *Id.*

Finally, in ruling on a motion for summary judgment, "[a] district court is not…obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim." *InterRoyal Corp. v. Sponseller*, 889 F.2d 108, 111 (6th Cir. 1989). Thus, in determining whether a genuine issue of material fact exists on a particular issue, the court is entitled to rely upon the Rule 56 evidence specifically called to its attention by the parties.

**III.    Analysis**

**A.    Discrimination**

Title VII of the Civil Rights Act of 1964 prohibits federal agencies from employment discrimination "based on race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–16(a). It is a violation of Title VII to fail to promote an employee because of his or her membership in a protected class. See, e.g., *White v. Columbus Metro. Hous. Auth.,* 429 F.3d 232, 240 (6th Cir. 2005). Plaintiff asserts he was discriminated against because of his race and national origin.

A plaintiff may establish a claim of discrimination either by presenting direct evidence of discrimination or by presenting circumstantial evidence that would support an inference of discrimination. *Kline v. Tenn. Valley Auth.*, 128 F.3d 337, 348 (6th Cir. 1997). Direct evidence is where an employer's statement directly shows discriminatory motive. See *Schlett v. Avco Fin. Servs., Inc.*, 950 F. Supp. 823, 828 (N.D. Ohio 1996). The Sixth Circuit stated in *Manzer v. Diamond Shamrock Chemicals Co.*, 29 F.3d 1078, 1081 (6th Cir. 1994), that evidence that would require the jury to infer a fact is not direct evidence. Direct evidence, in the form of verbal comments, will be similar to an employer telling its employee, "I fired you because you are disabled." *Smith v. Chrysler Corp.,* 155 F.3d 799, 805 (6th Cir. 1998). Plaintiff has no direct evidence that any of the actions of which he complains were motivated by race, leaving only the avenue utilizing circumstantial evidence established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04 (1973) to survive summary judgment.

Under *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04 (1973), when a claim is based on circumstantial evidence, a plaintiff must first establish a *prima facie* case of discrimination, the elements of which vary slightly depending on the theory asserted. To establish a *prima facie* case of discrimination based on a "failure to promote" theory, a plaintiff must demonstrate that:

> (1) she is a member of a protected class; (2) she applied for and was qualified for a promotion; (3) she was considered for and was denied the promotion; and (4) an individual of similar qualifications who was not a member of the protected class received the job at the time plaintiff's request for the promotion was denied.

*White*, 429 F.3d at 240.   A plaintiff's burden at the *prima facie* stage is "not onerous." *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981).

If the plaintiff establishes a *prima facie* case of discrimination, the burden shifts to the defendant to offer evidence of a legitimate, nondiscriminatory reason for its adverse action. If the defendant satisfies its burden, the burden shifts back to the plaintiff to identify evidence from which a reasonable jury could find that the stated reason is a pretext for discrimination. Id.

Initially, the Court notes that Plaintiff's Title VII claims arising from incidents occurring more than 300 days prior to his EEOC filing are time barred.   In order to assert Title VII claims, a plaintiff must file a complaint with the EEOC within 300 days after the alleged unlawful employment practice occurred. *Han v. University of Dayton*, 2012 WL 5576961 at *3 (S.D. Ohio December 21, 2012) citing *Delaware State College v. Ricks*, 449 U.S. 250, 257 (1980).   Failure to file within that period requires dismissal of the claims. Id.   Here, Plaintiff filed his EEOC complaint in this matter on October 6, 2015. (See Requests for Admission attached as Exhibit 3). Three hundred days prior to October 6, 2015 is December 4, 2014.   Therefore, all of Plaintiff's claims for Title VII discrimination prior to December 4, 2014 are barred.   This includes Plaintiffs claims for: (1) discrimination in hiring for the 2010 and 2013 hiring decisions for the Division Manager Position; (2) discrimination in hiring for the 2012 and 2013 Division Administrator Positions; and (3) all conduct by Gary Marshall, as he left employment with the City in July 2013. (Clements Aff. at ¶41).

In Ohio, a discrimination claimant may pursue a civil cause of action without first exhausting his administrative remedies. Ohio Rev. Code § 4112.99; *Elek v. Huntington Nat'l Bank*, 573 N.E.2d 1056, 1057-58 (Ohio 1991); Ca*rney v. Cleveland Heights-Univ. Heights City Sch. Dist.*, 758 N.E.2d 234, 243 (Ohio App. 2001).   Moreover, the statute of limitations for bringing a lawsuit under § 4112 is six years. See Ohio Rev. Code §§ 2305.07, 4112.99; *Cosgrove v. Williamsburg of Cincinnati Mgmt. Co.*, 638 N.E.2d 991, 992 (Ohio 1994); *Harrison v. City of Akron*, 43 F. App'x 903, 905 (6th Cir. 2002).   Thus, Plaintiff's discrimination claims that predate the federal statute of limitations are not necessarily barred under state law.

Plaintiff's federal racial discrimination and national origin claims fails at the initial *prima facie* stage because Plaintiff was not capable of performing the Division Manager position in 2016. The second element of a prima facie case of employment discrimination requires the plaintiff to show that "he applied and was qualified for a job for which the employer was seeking applicants." *Thompson v. UHHS Richmond Heights Hosp., Inc.*, 372 Fed. Appx. 620, 624 (6th Cir. 2010).   A plaintiff that was unable to perform the job cannot meet this prong. Id.

To satisfy the second prong of a *prima facie* case, a plaintiff must show that he suffered an "action by the employer that constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities or a decision causing a significant change in benefits." *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 402 (6th Cir. 2008).   Plaintiff admits that he did not apply for the 2013 posting of the Division Administrator position when Dave Wilson was hired. (Gupta Depo. at pg. 129).   Likewise, Plaintiff admits that in 2016 when Chris Clark was hired as the new Division Manager that the Plaintiff had already retired on a disability and was unable to work.   As such, Plaintiff's federal

claims involving the 2016 Division Manager hiring and the 2013 Division Administrator hiring fail as a matter of law.

## B.     Race Discrimination Under 42 U.S.C. §1981

Congress enacted 42 U.S.C. § 1981 to protect equal contracting rights of citizens regardless of race.   In order to establish a claim for racial discrimination under section 1981, a plaintiff must plead and prove that: (1) he belongs to an identifiable class of persons who are subject to discrimination based upon their race; (2) the defendant intended to discriminate against him on the basis of race; and (3) the defendant's discriminatory conduct interfered with his right to contract. *Amini v. Oberlin College*, 440 F.3d 350, 358 (6th Cir. 2006).

Plaintiff alleges that Dayton's failure to promote him interfered with his right to a contractual employment relationship with the City of Dayton. (See Compl. Count III). Plaintiff's claim fails because: (1) he has no direct or indirect evidence of discrimination; and (2) there was no interference of the Plaintiff's right to contract, as Plaintiff's employment with Dayton was not contractual.

Section 1981 does not apply because, as a City employee, the Plaintiff holds his position as a matter of law, not by contract. *Nealon v. Cleveland*, 140 Ohio App.3d 101, 746 N.E.2d 694 (8th Dist. 2000); *Estabrook v City of Dayton*, 1997 WL 1764764, *5 (S.D. Ohio March 24, 1997) (Rice, J.) ("the Ohio Supreme Court has twice held that 'a public officer or employee holds his office as a matter of law and not of contract, nor has such officer or employee a vested interest or private right of property in his office or employment.' *Fuldauer v. City of Cleveland*, 290 N.E.2d 546 (1972) (para. 3 of syllabus) (following *State ex rel. Gordon v. Barthalow*, 150 Ohio St. 499; 83 N.E.2d 393 (1948) (para. 1 of syllabus)").   As a result, a City of Dayton employee cannot bring

a claim for breach of contract, as there is no contract, the employee was employed as a matter of law." *Estabrook*, at \*5.   Accordingly, Plaintiff's § 1981 claim fails.

## C.    Retaliation Claim

Title VII forbids employer actions that discriminate against an employee because the employee participated in protected activity, such as an EEO investigation. *Burlington N. & Santa Fe Ry. Co v. White*, 548 U.S. 53, 59 (2006).   Where a plaintiff relies on indirect evidence to establish his claim, the familiar *McDonnell-Douglas* burden-shifting framework applies. *Laster v. City of Kalamazoo*, 746 F.3d 714, 730 (6th Cir. 2014).   To establish a *prima facie* case of retaliation, a plaintiff must demonstrate that: "(1) he engaged in activity protected by Title VII; (2) his exercise of such protected activity was known by the defendant; (3) thereafter, the defendant took an action that was materially adverse to the plaintiff; and (4) a causal connection existed between the protected activity and the materially adverse action." Id.   To satisfy the third prong, the plaintiff "must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N. Ry.*, 548 U.S. at 67–68 (internal quotation omitted).   The standard is objective and does not protect a plaintiff from trivial harms, such as petty slights, minor annoyances, and a simple lack of good manners, which are not likely to deter victims from complaining to the EEOC. Id. at 68.

In order to constitute protected activity for the purposes of Title VII or Ohio Revised Code § 4112.02, an employee must specifically allege discriminatory conduct based upon membership in a protected class. *Balding-Margolis v. Cleveland Arcade*, 352 Fed. Appx. 3, 45 (6th Cir. 2009).

Complaints about a supervisor or other general work-related issues that are not based upon membership in a protected class are insufficient to establish protected activity. Id.

In order to constitute a protected activity for the purposes of Title VII or Ohio Revised Code Section 4112.02, an employee must have previously specifically complained of discriminatory conduct based upon membership in a protected class. *Balding Margolis v. Cleveland Arcade*, 352 Fed. Appx. 3, 45 (6th Cir. 2009). "If an employee merely complains generally about job conditions, without making any allegation of unlawful discriminatory conduct, he has not engaged in a protected activity." *Canady v. Rekau, Inc*., 2009 Ohio-4974 (10th Dist. 2009). An employee's complaint about verbal berating he received from a supervisor that contained no reference to race, color, or national origin discrimination does not constitute protected conduct necessary for a retaliation claim. Id. at ¶41; citing *Smith v. International Paper Co*., 523 F.3d 845, 849-850 (8th Cir. 2008). "A vague charge of discrimination in an internal letter or memorandum is insufficient to constitute opposition to an unlawful employment practice. An employee may not invoke the protections of the Act by making a vague charge of discrimination. Otherwise, every adverse employment decision by an employer would be subject to challenge under either state or federal civil rights legislation simply by an employee inserting a charge of discrimination." *Fox v. Eagle Distribution Co*., 510 F.3d 587, 591-592 (6th Cir. 2007).

Plaintiff admits that he never once alleged that he was discriminated against based upon his race or national origin until after he left the City's employment in October of 2015. (See Requests for Admissions attached to Summary Judgment Motion as Exhibit 3). The first instance that the Plaintiff points to is an email to Tammi Clements from November 12, 2010. Not only is this incident beyond the statute of limitations, but nowhere in the email does the Plaintiff allege

that he was discriminated against based upon his race or his nationality. Likewise, the second complaint on September 1, 2014, where Plaintiff complained to Tincu about Tincu yelling at him and complaining about the Plaintiff being late likewise mentions no unlawful discrimination. This is the same concerning the last alleged conduct on December 31, 2014. There is no indication whatsoever in any of this correspondence that anything is due to unlawful discrimination. These allegations are even more vague than the allegations in *Booker* of alleged unlawful "ethnocism" that the Sixth Circuit found was insufficient.

Here, Plaintiff never complained of harassment or discrimination based upon race or national origin until October 2015, after he retired from the City on a disability pension. Prior to that, there were only three complaints concerning communications with his supervisors. None of these communications alleged any discrimination based upon race or national origin. As a result, Plaintiff cannot show a protected activity and likewise cannot show any causal relationship between a protected activity and an adverse employment action. Therefore, Dayton is entitled to summary judgment on this claim as well.

The Court expresses no opinion as to whether Plaintiff's claims under Ohio Revised Code § 4112 for racial and national origin discrimination would survive Defendant's motion. Under the supplemental jurisdiction provision of 28 U.S.C. § 1367, a court may decline supplemental jurisdiction where the court has dismissed all claims over which it has original jurisdiction. 28 U.S.C. § 1367(c)(3). The Court declines to exercise its supplemental jurisdiction over this matter and **DISMISSES** the remaining claims without prejudice.

IV.     **Conclusion**

Because many of Plaintiff's claims are time-barred, because Plaintiff was not qualified by reason of disability for the position he sought in 2016, and because the Court will decline to exercise pendant jurisdiction over Plaintiff's remaining claims, Defendant's motion, ECF 13, is **GRANTED IN PART** and the remaining claims dismissed.

The captioned cause is hereby **TERMINATED** upon the docket records of the United States District Court for the Southern District of Ohio, Western Division, at Dayton. **DONE** and **ORDERED** in Dayton, Ohio, this Wednesday, July 25, 2018.

s/Thomas M. Rose

_____
THOMAS M. ROSE
UNITED STATES DISTRICT JUDGE